# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 29, 2008 Session

## STATE OF TENNESSEE v. SHANNON ALAN GRIFFIN

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 255146      Rebecca J. Stern, Judge**

_____

**No. E2007-01311-CCA-R10-CD - Filed June 26, 2008**

_____

The defendant, Shannon Alan Griffin, was charged with two counts of attempted first degree murder, two counts of aggravated assault involving use of a deadly weapon, and two counts of aggravated assault causing serious bodily injury after twice hitting his landlord with his car. The jury found the defendant guilty of all four counts of aggravated assault but could not reach a verdict on the two counts of attempted first degree murder. The trial court merged the four aggravated assault counts into two convictions and, as to the attempted first degree murder counts, declared a mistrial and ordered a new trial. Pursuant to Tennessee Rule of Appellate Procedure 10, the defendant appeals from the trial court's decision, arguing that he may not be retried on the attempted first degree murder counts because there did not exist manifest necessity for a mistrial and a retrial would violate the Double Jeopardy Clause of the Fifth Amendment. Following our review, we affirm the trial court.

**Tenn. R. App. P. 10 Extraordinary Appeal; Order of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Daniel J. Ripper, Chattanooga, Tennessee, for the appellant, Shannon Alan Griffin.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William H. Cox, District Attorney General; and Bates Bryan, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

At trial, Sergeant Jerome Halbert of the Chattanooga Police Department introduced a recording of a statement taken from the defendant following his apprehension. In his statement, the defendant said that he had been having problems with the victim, who was his landlord and lived in

the other side of his duplex. Several weeks prior to the offenses, the defendant called the police to their residence because the victim was playing music loudly. After the police departed, the victim pounded on the defendant's door and threatened to assault him and have him thrown in jail. Two days before the offenses, the defendant gave the victim a letter stating that he was leaving at the end of the next month and a check for the next month's rent less his security deposit. He said that this upset the victim, who repeatedly called him and left threatening messages over the next two days. On the second day, the victim was playing his music loudly when the defendant returned home from a friend's house around 11:00 p.m. Sometime after midnight, the defendant called the police because the victim had not turned down his music.

The next day, the victim continued to leave messages on the defendant's phone while he was at work. When the defendant arrived home, the victim was not there but his music was playing loudly. The defendant called the police, who told him they could not do anything until the victim arrived home. Hours later, the victim arrived home and the defendant again called the police. The victim left before the police arrived. The defendant said the next thing he remembered was driving down Rossville Boulevard "in a haze." He saw the victim at a Krystal restaurant, pulled into the parking lot, and confronted him about his recent behavior. As the defendant was driving through the parking lot, the victim pulled out of the drive-through lane and cut him off. The defendant decided to try to back up and go around the victim's truck; as he did so, the victim got out of his truck, approached the defendant's car from the passenger's side, jumped onto the hood, and fell over the driver's side. The defendant estimated his speed was five miles per hour and said he continued driving because "I know I didn't hurt him."

The defendant said that during the encounter he heard a voice telling him, "He's gonna screw you over." The next thing he remembered was returning to Krystal and seeing the victim's face as his car bounced up and down. He said that he watched everything unfold "like a dream" and that he did not remember how fast he was going or which direction he was traveling during his second trip through the Krystal parking lot. He stated that he returned to his apartment and waited for the police to arrive to respond to his noise complaint. He said he believed that his "haze" was a result of the stress of dealing with the victim. He denied that he went looking for the victim when he got into his car.

The defendant said that in the days following the encounter, he had a "gut feeling" telling him to run. He drove to Jacksonville, Florida, to try to make sense of what had happened. As he was driving, he saw images in his head of the victim's face and his car bouncing up and down. He then drove to Michigan and turned himself in to the police.

The victim testified that he had a good relationship with the defendant until just prior to the offenses. Their relationship began to deteriorate when the defendant parked his car on the grass in front of the duplex and kicked a hole in one of the walls. The victim said he served the defendant with an eviction notice after he kicked a hole in the wall. He denied that he left the radio on to induce the defendant to move out.

-2-

The victim stated that on May 2, 2005, he worked all day and returned home around 10:00 p.m. to let his dogs out. He then went to Krystal and pulled into the drive-through lane. He decided that the line was too long, so he parked his truck and got out. He said the only thing he remembered after exiting his vehicle was being hit by the defendant's car.

The victim testified that as a result of the offenses he suffered a lacerated liver, a collapsed lung, and a tracheotomy. He incurred fractures in his nasal bone, clavicle, femur, ribs, pelvis, skull, and eye socket and lost his right eye. On cross-examination, the victim denied that the defendant had confronted him about noise or that the police had spoken to him about a noise complaint. He denied ever threatening by phone to physically harm the defendant.

Natasha Eppinger, who was working in the Krystal drive-through on May 2, 2005, testified that at the beginning of her shift she saw the victim's truck pull out of her drive-through line. She saw the victim exit his truck and get hit by a small car. She called for help, then returned to her window and saw the same car hit the victim again, drag him toward the dumpster, and drive off.

Candice Barnes was in the Krystal drive-through lane behind the victim's truck when the defendant's car emerged from an alley and nearly hit her car. She said the defendant pulled up beside the victim's truck and confronted him. She testified that the victim attempted to pull away, but the defendant blocked him in. The victim got out of his truck and the defendant accelerated. The force of the collision threw the victim over the car and onto the pavement. The defendant left the parking lot, and the victim asked Barnes to call the police. Shortly thereafter, the defendant returned to the parking lot at a higher rate of speed and hit the victim again, dragging him through the parking lot.

Dr. Patrick J. Bowers, Jr., an ophthalmologist, testified that he treated the victim for injuries to his right eyelid and cornea. He testified that the victim eventually lost vision in his right eye, which had to be removed. Dr. Donald Barker, a general surgeon who treated the victim in the emergency room after the offenses, testified that the victim had a severe pelvic fracture, a femur fracture, fractured ribs on the right side of his chest, a partially collapsed right lung, and a lacerated liver.

The defendant elected not to testify or present other proof. The jury began deliberations at 10:25 a.m. on November 30, 2006. At some time during deliberations, the jury sent the trial court a note stating that they could not reach an agreement on the attempted first degree murder counts. At 4:15 p.m., the court called the jury into the courtroom, where the following exchange took place:

THE COURT: Okay. You all sent me . . . a note earlier saying that there was a big or small problem, that on Counts 1 and 2 you all were split and you thought – kind of indicated maybe hopelessly split. Has the jury reached verdicts on Counts 3, 4, 5 and 6?

[JURY FOREPERSON]: Yes, ma'am.

THE COURT:  And have you completed the verdict forms on those?

[JURY FOREPERSON]:  Yes, ma'am.

THE COURT:  Do you feel like . . . if there was any amount of further deliberation that you would be able to come together on Counts 1 and 2 or do you think you're hopelessly deadlocked?

[JURY FOREPERSON]:  The voices spoken as though we are deadlocked.  But I'm not really sure if the juror that feels that way understands what is being said.

THE COURT:  Well, you mean what the consequences are?

[JURY FOREPERSON]:  No, ma'am.

THE COURT:  Okay.  Well --

[JURY FOREPERSON]:  Do you want me to speak openly?  I mean --

THE COURT:  Well, I don't want you to embarrass anybody or point out any names or anything.

[JURY FOREPERSON]:  No, ma'am, not calling names.

THE COURT:  Yes, go ahead.

[JURY FOREPERSON]:  But okay, well, we do have according – you know, like you say, we do have 3, 4, 5 and 6 we have those filled out, the counts.  But on 1 and 2 is where we do divide.  And that juror in particular actually said that they're basing their opinion from past experience.   And I'm not really sure if that person understands what's going on.  And so by that being the case that one makes a difference.

THE COURT:  Okay.  Well, that's fair.  Well, I know you've worked long and hard and it sounds to me like possibly on it – as far as – what I can do is take the verdict from the others and declare a mistrial on Count Nos. 1 and 2 and we'll just try it over again with a different jury.  That's what will happen.

So I'm going to declare a mistrial on Count Nos. 1 and 2 because I'm going to declare the jury is hung on Count Nos. 1 and 2.

Subsequently, the defendant filed a motion to dismiss the attempted first degree murder counts on the grounds that the mistrial was granted without manifest necessity, and the retrial of the

defendant would place him in jeopardy twice for the same offense. The trial court denied the motion by written order, stating:

> The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Article I, § 10 of the Tennessee Constitution prohibit successive prosecutions, whether the first ends in conviction or acquittal, and multiple punishments for the same offense. In a jury trial of a case in which the court has jurisdiction, jeopardy attaches when the jury is impaneled and sworn. [citation omitted]

> Not every retrial, however, is unconstitutional. One exception to the general unconstitutionality of retrials is the existence of manifest necessity for the declaration of a mistrial. In cases in which the defendant did not consent to declaration of a mistrial, several principles guide the application of the exception by trial courts. [citations omitted]

> . . . .

> The record reflects that, when the jury first indicated that it could not agree on verdicts on the counts of attempted first-degree murder, the Court admonished it that its verdicts must be unanimous and urged it to continue deliberating. One juror even wrote to inform the Court that he would never change his mind. The Court's response was to suggest that perhaps he could change the minds of the other jurors. When the jury again reported that they could not agree on the verdicts, however, the Court inquired whether they were hopelessly deadlocked. Although the foreperson did not respond to this inquiry with a simple "yes" or "no", from his response and the Court's prior exchanges with the jury, it was apparent to the Court that it would be futile to repeat the unanimity instruction or give the jury another opportunity to agree. The Court therefore finds that there was a manifest necessity for the declaration of a mistrial on the counts of attempted first-degree murder. It follows that the discharge of the jury pursuant thereto did not operate as an acquittal on and does not bar the retrial of those counts.

The defendant then filed an extraordinary appeal, pursuant to Tennessee Rule of Appellate Procedure 10, challenging the trial court's ruling that he may be retried on the attempted first degree murder counts.

## ANALYSIS

The defendant argues that he may not be retried on the attempted first degree murder counts because a mistrial was not required by manifest necessity, and retrial would place him twice in jeopardy for the same offense, in violation of the Fifth Amendment. The State responds that

-5-

manifest necessity was present and retrial does not violate the Double Jeopardy Clause. As we will explain, we agree with the State.

## I. Manifest Necessity

No person shall, for the same offense, be twice put in jeopardy of life or limb. U.S. Const. amend. V; Tenn. Const. art. I, § 10. The prohibition on double jeopardy protects against a second prosecution for the same offense after acquittal or conviction and multiple punishments for the same offense. State v. Beauregard, 32 S.W.3d 681, 682 (Tenn. 2000). In a jury trial, jeopardy attaches when the jury is sworn. State v. Pennington, 952 S.W.2d 420, 422 (Tenn. 1997).

Where a defendant's first trial is terminated before a finding of guilt or acquittal, a second prosecution for the same offense is not barred if there existed a "manifest necessity" for termination of the first proceeding, regardless of the defendant's consent or objection. State v. Smith, 871 S.W.2d 667, 671-72 (Tenn. 1994); State v. Mounce, 859 S.W.2d 319, 321 (Tenn. 1993). "The impossibility of a jury reaching a verdict has long been recognized as a sufficient reason for declaring a mistrial." Id. at 321-22. The failure of a jury to reach a verdict is not an event which terminates jeopardy. Richardson v. United States, 468 U.S. 317, 325 (1984).

The Tennessee Supreme Court has adopted several principles to guide trial courts in their application of the manifest necessity doctrine. The determination of whether to grant a mistrial and permit a retrial rests with the sound discretion of the trial court. When ascertaining whether a mistrial is appropriate, trial courts should consider all relevant factual circumstances, and the burden of proving manifest necessity rests on the State. "Finally, retrial will not be prohibited by double jeopardy principles where the ends of justice, under the circumstances, would otherwise be defeated, or where the circumstances show that a fair and unbiased trial could not be had, or where any unforeseen emergency, contingency, or happening after the empaneling of the jury prevents the trial from going forward according to orderly and established legal procedure." Smith, 871 S.W.2d at 672. Additionally, "great deference should be paid by a reviewing court to the trial court's decision to declare a mistrial because the jury is unable to agree upon a verdict." Id. at 672-73.

The defendant argues that the trial court erred in declaring a mistrial because it did not ascertain with certainty whether the jury was "hopelessly deadlocked." In support of this argument, he cites State v. Skelton, 77 S.W.3d 791, 798 (Tenn. Crim. App. 2001), where this court held that when jurors return with a non-unanimous vote, the trial court must either return them to the jury room for further deliberations or ask the jurors whether they believe a verdict might be possible after further deliberation. He argues that, although the trial court asked the jury whether it believed it could reach a unanimous verdict, the foreperson's response, "The voices spoken as though we are deadlocked," is too ambiguous to support a finding of manifest necessity.

We disagree with the defendant's contention that the circumstances did not support the trial court's finding of manifest necessity and declaration of a mistrial. The record reflects that the jury deliberated for nearly six hours before determining that it could not reach a verdict on the attempted

first degree murder counts. Included in the record is a note from one juror to the trial court stating, "I shall <u>not</u> change my mind regardless of how long we deliberate." In response to this note, the trial court encouraged the juror to attempt to change the minds of the other jurors. In its order denying the defendant's motion to dismiss, the trial court stated that jurors shook their heads to indicate their lack of hope of unanimity when asked if further deliberations might be productive. As stated above, we afford great deference to a trial court's decision to grant a mistrial based on the inability of the jury to reach a unanimous verdict. The record supports the determination of the trial court that a mistrial was warranted by manifest necessity.

## II. Retrial

The defendant also argues that he may not be retried for the two counts of attempted first degree murder because to do so would place him twice in jeopardy for the same offense. He analogizes to <u>State v. Adams</u>, 973 S.W.2d 224, 229 (Tenn. Crim. App. 1997), where this court held that the defendant could not be convicted of both aggravated assault and attempted first degree murder, based on the same criminal conduct, because the two offenses were the same for purposes of double jeopardy analysis. The <u>Adams</u> court reversed the defendant's conviction for aggravated assault and vacated the defendant's sentence for that offense. <u>Id.</u> The State agrees that the defendant may not be convicted of both aggravated assault and attempted first degree murder but argues that <u>Adams</u> does not bar retrial of the defendant. The State contends that if the defendant is convicted of attempted first degree murder at the second trial, the proper procedure is to merge his convictions for attempted first degree murder and aggravated assault. As we will explain, we agree with the State.

Initially, we note that <u>Adams</u> is distinct from this case. There, the defendant was convicted in the same proceeding of both attempted first degree murder and aggravated assault. The holding in <u>Adams</u> was based on the principle that a defendant may not be punished twice for the same offense. 973 S.W.2d at 229. In the present appeal, the defendant was convicted of aggravated assault, but the jury could not reach a verdict on attempted first degree murder. To this point, he has been subjected to only one punishment for each instance of striking the victim. <u>Adams</u> does not hold that a defendant may not be retried following a finding of guilt on aggravated assault and a mistrial on attempted first degree murder.

As to this issue, the State relies upon <u>State v. Conway</u>, 77 S.W.3d 213 (Tenn. Crim. App. 2001), in which the defendant was charged with DUI and DUI *per se* based on the same criminal conduct. The jury at his first trial acquitted him of DUI but could not reach a unanimous verdict on the charge of DUI *per se*. The defendant was retried and convicted of DUI *per se*. <u>Conway</u>, 77 S.W.3d at 217. He argued on appeal that his retrial placed him twice in jeopardy for the same offense. However, this court affirmed his conviction, holding that the double jeopardy clause did not preclude the State from retrying the defendant because both DUI and DUI *per se* could be determined by the jury without an election, and each offense contained different elements. <u>Id.</u> at 218.

In this case, unlike Conway, the defendant was *convicted* of one offense and the jury could not reach a verdict on the second offense. Nevertheless, the holding of Conway remains applicable. The jury could make a determination of guilt or innocence on both attempted first degree murder and aggravated assault without the State making an election. The offenses of attempted first degree murder and aggravated assault contain different elements. Compare Tenn. Code Ann. §§ 39-13-202(a), 39-12-101 and Tenn. Code Ann. § 39-13-102(a). Retrial of the defendant will not violate his Fifth Amendment right not to be placed twice in jeopardy for the same offense. If the defendant is convicted of attempted first degree murder upon retrial, his attempted first degree murder conviction(s) will merge with his aggravated assault convictions. See State v. Calvin Fleming, No. W2006-00098-CCA-R3-CD, 2007 WL 609889, at *7 (Tenn. Crim. App. Feb. 27, 2007).

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE